Filed 2/6/23 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of D.H. and B.G. | D079801 |
| D.H., | |
| Appellant, | (Super. Ct. No. D474390) |
| v. | |
| B.G., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Respondent. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on January 17, 2023, be modified as follows:

The entire paragraph beginning on the bottom of page 7 (beginning with "The relevant provisions of . . .") and continuing on page 8 is deleted and replaced with the following:

> The Family Code expressly contemplates the relief Father was seeking. In connection with temporary child support orders, section 3601, subdivision (a) states that a child support obligation may "terminate[] by operation of law pursuant to Sections 3900, *3901*, 4007, and 4013." (Italics added.) Section 3901 itself makes no distinction between temporary and final child support orders. This supports

Father's contention that a final child support obligation similarly terminates by operation of law under section 3901, subdivision (a) once the child is 18 and no longer a full-time high school student.  Section 4007 further provides that upon the happening of a specified contingency, such as emancipation, "the obligation of the person ordered to pay support terminates on the happening of the contingency[]" and the payor may receive a refund for overpayments, which is precisely the relief Father requested.  (See § 4007, subds. (a) & (b).)

Immediately before the last sentence of the first full paragraph on page 9 (beginning with "Accordingly, we conclude . . ."), the following sentence is inserted:

For this reason, Mother's reliance on cases involving retroactive modification or termination of *accrued* child support is misplaced.  (See, e.g., *S.C. v. G.S.* (2019) 38 Cal.App.5th 591, 599 [applying rule against retroactive modification of a child support order for "payments that have already accrued"].)

The second sentence of the full paragraph on the middle of page 24 (beginning with "Rather, Father obtained . . .") is deleted and replaced with the following:

Rather, Father obtained evidence in the fall of 2020 suggesting to him that A.G. was no longer a full-time student, so he sought a refund through the channel provided by subdivision (b) of section 4007.

The second sentence of the paragraph beginning on the middle of page 26 (beginning with "Under Family Code section 4007 . . .") is deleted and replaced with the following:

Family Code section 4007, subdivision (a), authorizes the court to order the custodial parent to notify the other parent of the occurrence of a contingency under section 3901 that would terminate his child support obligations.

2

There is no change in judgment.

The petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

Filed 1/17/23 (unmodified opinion)

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re the Marriage of D.H. and B.G. | D079801 |
| D.H., | |
| Appellant, | (Super. Ct. No. D474390) |
| v. | |
| B.G., | |
| Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Adam Wertheimer, Commissioner.  Reversed and remanded with directions.

Antonyan Miranda, Anthony J. Boucek and Timothy Miranda for Appellant.

No appearance for Respondent.

After D.H. (Mother) and B.G. (Father) divorced, Father was obligated to pay $10,000 per month in child support for the parties' youngest child, A.G., subject to Family Code section 3901.[1]  Section 3901, subdivision (a)(1), provides that child support continues for an unmarried child who has turned

---

[1]    All further undesignated statutory references are to the Family Code.

18 years old, is a full-time high school student, and is not self-supporting, until he or she finishes 12th grade or turns 19 years old, whichever happens first.

Father filed requests for orders (RFOs) seeking (1) a judicial determination that his child support obligation had terminated and (2) a refund of overpaid support—both on the basis that A.G. had turned 18 and was no longer enrolled as a full-time high school student after June 2020. Father also sought sanctions against Mother pursuant to section 271. The trial court declined to impose sanctions, but granted Father's other requests, finding that A.G. was no longer a full-time high school student as of July 1, 2020, and ordering Mother to refund overpaid amounts of child support.

On appeal, Mother argues that the court erred by: (1) misinterpreting the meaning of "full-time" in section 3901; (2) finding that A.G. was not a "full-time" high school student; (3) terminating child support retroactively; (4) implicitly finding a material change of circumstance to justify modifying child support; (5) relying on unadmitted evidence; and (6) improperly shifting the burden of proof to Mother on Father's RFOs.[2]

We conclude that "full-time" in Family Code section 3901 generally has the same meaning as set forth in Education Code section 48200 regarding compulsory education for minor children: "the length of the schoolday [designated] by the governing board of the school district in which the residency of either the parent or legal guardian is located." (Ed. Code, § 48200.) Because the trial court did not apply this definition, we reverse the court's order and remand for further proceedings and additional discovery, if

---

[2]    Because Father filed no brief, we determine the appeal based on the appellate record and Mother's opening brief. (Cal. Rules of Court, rule 8.220(a)(2).)

2

necessary, so that the court may make appropriate findings and enter a new order consistent with this opinion. We reject Mother's remaining arguments.

## FACTUAL AND PROCEDURAL BACKGROUND

This marital dissolution proceeding has been pending for 20 years. The record on appeal does not include any of the pleadings or orders before 2020, but one of the family court's orders suggests that there has been a "long history of protracted, contentious and seemingly unnecessary litigation."

Mother had primary custody of the parties' youngest child, A.G. In 2019, the parties agreed that Father would pay child support at a previously set amount of $10,000 per month, but only for A.G., who was the parties' remaining minor child. A.G. turned 18 in March 2020.

Father filed RFOs in July and September 2021 seeking a determination that his child support obligations had terminated, a return of overpaid support, and sanctions under section 271. He alleged that A.G. was over the age of 18 and no longer enrolled as a full-time high school student after June 2020, so post-majority child support had terminated as a matter of law at that time pursuant to section 3901. Father sought repayment of child support he paid in July, August, and September 2020, totaling $20,000 after subtracting a $10,000 refund he had received in January 2021.

Mother submitted a responsive declaration attaching certified copies of A.G.'s high school diploma and transcript. She also requested that the court determine child support arrears, asserting that Father owed child support until A.G. turned 19 in the spring of 2021. Mother's declaration stated that A.G. had started high school at age 15 in the fall of 2017. A.G. resided solely with Mother after her 17th birthday, and she turned 18 in the spring of 2020 shortly before her junior year ended in June 2020. Father had not visited with A.G. since approximately March 2019.

3

After June 2020, A.G. took a summer class at Ingenuity Charter School (Ingenuity), but in September 2020, A.G. entered an inpatient treatment facility where she remained until January 2021.

According to Mother, A.G. received treatment for a chronic eating disorder for most of her teen years and did not follow a traditional school calendar as a result. During the first month of A.G.'s inpatient treatment in September 2020, she was not permitted to attend classes. A.G.'s transcript reflects that she took one class through Grossmont Adult School in the fall of 2020, and no classes during the winter from late 2020 to early 2021, while she was still in inpatient treatment. However, she took two classes in the spring of 2021 after her discharge and earned a high school diploma in May 2021 from Grossmont Adult School, four years after starting high school in the fall of 2017.

Father submitted a reply declaration in which he summarized A.G.'s transcript, listing the year and school in which she earned credits. A.G. took 50 credits her freshman year (2017-2018) at West Hills High School; 60 credits at the same school her sophomore year (2018-2019); five credits at Apex Learning over the summer of 2019; 40 credits her junior year (2019-2020) at River Valley and Grossmont College; five credits at Ingenuity during the summer of 2020; and a total of 20 credits her senior year (2020-2021) from Grossmont Adult School (Grossmont).

Father stated in his declaration that "[a] quick phone call to [Grossmont] confirmed that to be a full-time student . . . one must have fifteen credits per quarterly term." He asserted that because A.G. was only taking five credits for each of the first and third terms of her senior year, zero credits her second term, and 10 credits her fourth term, she was not enrolled as a full-time high school student during any term that year.

4

At the first hearing on Father's RFOs in October 2021, the parties agreed to have the court decide the matter on the papers without an evidentiary hearing and the court heard arguments from both sides. The court indicated that after "read[ing] all the pleadings" and "all the exhibits," its tentative ruling was that A.G. was not a full-time student after June 2020 based on Father's evidence that 15 credits constituted "full-time" at Grossmont. Mother's counsel noted that the source of that information was a statement in Father's reply declaration about what somebody told him over the phone. The court reiterated that it would not be holding an evidentiary hearing unless the parties requested one, and that the parties were otherwise agreeing to submit on the papers.

Mother's counsel went on to argue that "full-time" should mean a student who is on a trajectory to matriculate in four years, which A.G. had satisfied. Mother's counsel concluded his argument by observing that it appeared the court had "read everything . . . . And so I don't think there's anything else and [Father's counsel] indicated that he's the one that didn't want additional evidence. So I'm finished, as far as we're concerned."

In arguing for sanctions, Father's counsel said that Father received information in September 2020 from River Valley that A.G. was no longer in school. Mother's counsel objected on hearsay grounds, prompting the court to respond that "[t]he problem . . . is a lot of the evidence I have is hearsay. And it seems that for the most part both of you are submitting on it[.]" Mother's counsel said that "what the [River Valley] charter school told [Father] was not for the truth. . . . So it's not relevant. And I'd already raised the objection to the unidentified person that said 15 units." The court overruled the hearsay objection as to information from River Valley and observed that it was "not that relevant in any case."

5

The court held a second hearing to deliver its decision and subsequently issued a written order finding that A.G. left River Valley in June 2020, and then attended Grossmont for four quarters. The court further found that the "plain meaning" of section 3901 supported finding that A.G. ceased to be a full-time high school student after June 2020 because "[h]er attendance at [Grossmont] did not meet the school's definition of full time." In reaching that conclusion, the court noted that Father had presented evidence that Grossmont "considers full time attendance to be at least 15 units[,]" and there was no evidence that A.G. was excused from the full-time student requirement because of a medical condition documented by a physician. (See § 3901, subd. (a)(2) [exception to full-time requirement for a documented medical condition].) The court also observed that Mother offered no evidence to contradict the court's findings, nor did she submit evidence that A.G. was engaged in other activities or classes outside of attending Grossmont.

The court made no reference to A.G.'s summer coursework in its order. When asked by Mother's counsel at the second hearing whether the court gave consideration to A.G.'s summer 2020 credits, the court said that it did not have A.G.'s transcript on hand, but it "went through the transcript and after she left River Valley, it appeared she went right to Grossmont Adult School." The court denied Father's request for sanctions, but ordered any amounts overpaid by Father after June 2020 to be refunded. Mother timely appealed the order.

DISCUSSION

I

We begin with Mother's threshold argument that the trial court lacked jurisdiction to terminate child support retroactively. We also address her

6

related contention that even if the court had jurisdiction to terminate child support, the court erred by implicitly finding a material change of circumstances.

Mother's arguments first require that we correct her characterization of the relief Father sought. Mother presumes that Father's RFOs requested retroactive modification of a child support order. However, Father was instead seeking a judicial determination that his child support obligation had already terminated *as a matter of law*. (See *Look v. Penovatz* (2019) 34 Cal.App.5th 61, 65, fn. 6 ["Under section 3901, subdivision (a)(1), a parent's child support obligation terminates by operation of law once the child is 18 and no longer a full-time high school student."].) Father was not seeking a downward adjustment as was the case in most of the cases cited in Mother's brief. (See, e.g., *In re Marriage of Cryer* (2011) 198 Cal.App.4th 1039, 1048 (*Cryer*) [father sought downward modification of child support based on change in circumstances due to initiation of dependency proceedings]; *In re Marriage of Williams* (2007) 150 Cal.App.4th 1221, 1235 [father sought reduction of monthly child support on ground that mother's changed circumstances warranted a downward adjustment]; *In re Marriage of Stephenson* (1995) 39 Cal.App.4th 71, 74 [ex-husband sought order reducing spousal support because of a change in circumstances arising from his election to take early retirement].)

The relevant provisions of the Family Code expressly provide for the remedy Father was seeking. Section 3601, subdivision (a) states that "[a]n order for child support . . . continues in effect until the order (1) is terminated by the court or (2) terminates *by operation of law* pursuant to Sections 3900, *3901*, 4007, and 4013." (Italics added.) Section 4007 provides that upon the happening of a specified contingency, such as emancipation, "the

7

obligation of the person ordered to pay support terminates on the happening of the contingency[]" and the payor may receive a refund for overpayments, which is precisely the relief Father requested. (See § 4007, subds. (a) & (b).)

The pleadings confirm that Father was seeking a judicial determination that his child support obligation had already terminated as a matter of law, not a retroactive modification of child support. Rather than indicating on his FL-300 Request for Order forms that he was seeking a "change" in child support, Father's RFOs specified he was seeking "other" relief: a determination that "child support terminated as a matter of law" and that "child support was reduced to zero in June[] 2020" pursuant to section 3901. The trial court also recognized the nature of Father's claim by framing its findings in terms of whether A.G. had "emancipated," a contingency triggering termination of a payor's support obligation in section 4007.

Mother cites section 3651, which provides that "a support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." (§ 3651, subd. (c)(1).) She also cites section 3653, which states that "[a]n order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date[.]" (§ 3653, subd. (a).) According to Mother, these provisions precluded the trial court from finding that Father's support obligation terminated prior to the date he filed his first RFO in July 2021.

We disagree. By their own terms, sections 3651 and 3653 apply to orders modifying or terminating child support, not orders finding that a parent's child support obligation has already terminated as a matter of law.

8

This reading is consistent with the wording of section 3651, subdivision (c)(1), which refers to modification or termination of "an amount that *accrued* before" the filing of the motion or order to show cause. (Italics added.) Father contended that his obligation to pay support terminated as a matter of law upon the occurrence of a contingent event pursuant to sections 3901 and 4007. If he was correct, then no amount would have *accrued* from the date of the contingency. Accordingly, we conclude that the rule against retroactive modification or termination of child support does not apply here.

For similar reasons, we reject Mother's argument that the trial court made an unsupported implicit finding of a change in circumstances. The court made no such finding regarding changed circumstances, implicit or otherwise, because it found instead that Father's child support obligation had terminated as a matter of law. And since Father was not required to present any evidence of changed circumstances, there is no merit to Mother's argument that his evidence was insufficient in that respect.

We therefore conclude that the trial court did not lack jurisdiction to rule on Father's RFO seeking a determination that his child support obligation had terminated as a matter of law in June 2020, and because it made no finding regarding a material change in circumstances, there was no error in that respect.

9

## II

We turn next to the primary issue on appeal, which is whether A.G. was a "full-time" high school student after June 2020, and therefore entitled to continued post-majority child support under section 3901 until her 19th birthday in the spring of 2021.

A.      *Meaning of "Full-Time"*

Court-ordered child support ordinarily terminates when the child reaches age 18, the age of majority.  (Fam. Code, §§ 58, 6500-6502; Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2022) ¶¶ 6:20, 6.700.)  However, section 3901, subdivision (a), provides in relevant part:

> "(1) The duty of support imposed by Section 3900 continues as to an unmarried child who has attained 18 years of age, is a *full-time high school student*, unless excused pursuant to paragraph (2), and who is not self-supporting, until the time the child completes the 12th grade or attains 19 years of age, whichever occurs first.
>
> "(2) A child is excused from the requirement to be a *full-time high school student* for purposes of paragraph (1) if the child has a medical condition documented by a physician that prevents full-time school attendance."  (Italics added.)

Neither section 3901 nor any other Family Code provision defines "full-time high school student," and the statute does not address how many credits or what amount of time in school constitutes "full-time."  The proper interpretation of this term is a question of law we review de novo.  (See *United Educators of San Francisco etc. v. California Unemployment Ins. Appeals Bd.* (2020) 8 Cal.5th 805, 812 (*United Educators*); *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 470 ["interpreting the law is a judicial function"].)  Our task is to " 'ascertain the intent of the lawmakers so as to effectuate the purpose of the statute[,]' and we start by giving the words in the statute 'their usual and ordinary meaning' " while

10

construing them in light of the statute as a whole and its purpose. (*United Educators*, at p. 812, internal quotation marks omitted.)

Without citation to any authority supporting her proposed definition, Mother contends that "full-time" should mean "demonstrably engaged towards timely graduation[]" within a traditional four-year time period for completing high school. The trial court rejected Mother's proposed definition and instead adopted Father's position that the term's meaning depends on what the child's school considers to be a "full-time" *course load*, including during the summer. We disagree with both interpretations. As we explain, we conclude that the term "full-time" as used in section 3901 generally carries the same meaning as set forth in Education Code section 48200: "the length of the schoolday" as designated "by the governing board of the school in which" the parent or legal guardian resides.

We begin with the usual and ordinary meaning of the term. Webster's Third New International Dictionary defines "full-time" as "employed for or working the amount of time considered customary or standard" or "involving or operating the amount of time considered customary or standard." (Webster's 3d New Internat. Dict. (2002) p. 919.) The Oxford English Dictionary defines the term as "[t]he total number of hours normally allotted to daily or weekly work, etc.; all of a person's available time." (Oxford English Dict. Online (2022) <https://www.oed.com/view/Entry/75366> [as of January 10, 2023], archived at <https://perma.cc/F75M-ZNNB>.) In the current context, these definitions indicate that "full-time" means whatever is considered the customary, standard, or normally allotted time for high school attendance.

These dictionary definitions comport with the definition contained in Education Code section 48200. Importantly, when the predecessor to Family

11

Code section 3901 was first enacted in 1985 as former Civil Code section 196.5 (Stats. 1985, ch. 379, § 1, p. 1547), the term "full-time" already had the meaning attributed to it in Education Code section 48200, which had been in effect for nearly a decade.  (Stats. 1976, ch. 1010, § 2.)  Education Code section 48200 provides that all children "between the ages of 6 and 18 years" old are, unless exempted, "subject to compulsory full-time education."[3]  The statute further provides that non-exempt children must "attend the public full-time day school or continuation school . . . for the full time *designated as the length of the schoolday by the governing board of the school district in which the residency of either the parent or legal guardian is located.*"[4]  (Ed.

---

[3]    Education Code section 48220 et seq., sets forth certain exemptions from compulsory education requirements, including but not limited to: private school students, students with private tutors, students with work permits, and students taking approved leave of absence to travel, study, train, or work.  (See Ed. Code, §§ 48222, 48224, 48225.5, 48230, 48232.)

Education Code section 48400 et seq., includes similar provisions exempting categories of continuation school students (see fn. 4, *post*) from compulsory education requirements.  (See, e.g., Ed. Code, §§ 48410 [miscellaneous], 48415 [private school students], 48416 [approved leaves of absence].)

[4]    "Continuation schools" provide classes to students between 16 and 18 years of age who have not graduated from high school and, for various reasons, require an alternative or flexible school attendance schedule.  (See Ed. Code, §§ 48413, 48430, 48432.3, 48432.5b; see also *Continuation Education – CalEdFacts* (2022) <https://www.cde.ca.gov/sp/eo/ce/cefcontinuationed.asp> "Continuation education provides a high school diploma program that meets the needs of students of ages sixteen to eighteen who have not graduated from high school, are not exempt from compulsory school attendance, and are deemed at risk of not completing their education." [as of January 10, 2023], archived at <https://perma.cc/U62Z-MGQ5>.)

12

Code, § 48200, italics added.) This is consistent with the dictionary definition of "full-time" as meaning the customary, standard, or normally allotted time.

We presume that the Legislature is aware of existing laws when enacting new legislation. (See *Viking Pools, Inc. v. Maloney* (1989) 48 Cal.3d 602, 609.) Because Education Code section 48200 defined the term "full-time" student before the predecessor of Family Code section 3901 was enacted, and because the Legislature specifically chose to use the term "full-time" instead of more generic language, we presume that the Legislature intended to use those terms consistently. (See, e.g., *People v. Yartz* (2005) 37 Cal.4th 529, 538 [Legislature presumed to have been aware of existing statutory definitions of "civil suit" and to have intended same meaning when using the term in new statute]; see also *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1043 ["When the Legislature uses language identical to that of an existing statute in newly enacted legislation, it is presumed that the same construction is intended."].) The relevant provisions in both codes relate to children seeking an education, and they each have the purpose of providing children with educational opportunities to fulfill their potential. (See Ed. Code, § 33080 ["the purpose of the educational system of this state is to enable each child to develop all of his or her own potential"].) We therefore conclude that they should be interpreted consistently.

We further conclude that this definition best serves the purposes of section 3901 as set forth in its legislative history. In 1985, the Legislature enacted former Civil Code section 196.5, the predecessor to section 3901.

The record indicates that Grossmont may be a continuation school. Continuation school students are also subject to compulsory education requirements, and according to Education Code sections 48400, 48413, 48431, and 48432, continuation schools are overseen by the school district's governing board. There is nothing in the record showing what the governing board has designated as the length of the schoolday for Grossmont.

(See Cal. Law Revision Com. com., 29F West's Ann. Fam. Code (2013 ed.) foll. § 3901, p. 20; Stats. 1985, ch. 379, § 1, p. 1547.)  The purpose of the bill was to "ensure that parents support their children until the child has had an opportunity to complete a high school education."  (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 716 (1985-1986 Reg. Sess.) as amended June 26, 1985, p. 2.) While noting that child support statutes presume a child can be self-supporting when they reach 18 years old, the age of majority, the Legislature acknowledged that some children turn 18 before graduating from high school.  (*Ibid.*)  Another focus of the bill was to encourage a child's self-support by promoting employability and curbing potential abuse of a child's right to support.  The source of the bill asserted that " '[p]ublic policy favors education of all capable individuals at least through the twelfth grade so as to produce a more employable citizen.' " (*Ibid.*)  Furthermore, "the 'cut-off date at the child's nineteenth birthday [was] added to discourage abuse in a situation where a child might not be making a good faith effort to complete his or her high school education.' " (*Id.* at p. 3.)

As for the language in the bill, when it was first introduced, it provided that child support obligations would continue "as to any unmarried child who has attained the age of 18, *is making a good faith effort to obtain a high school education*, and resides with a parent, until such time as he or she completes the 12th grade or attains the age of 19, whichever occurs first." (Assem. Bill No. 716 (1985-1986 Reg. Sess.) as introduced Feb. 14, 1985.)[5] However, before enactment, an Assembly committee report expressed concern

---

[5]    On our own motion, we take judicial notice of this legislative history under Evidence Code sections 452, subdivision (c), and 459.  (See *Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1541, fn. 9 ["We may take judicial notice of legislative history materials on our own motion."].)

about "what efforts on the part of the child would constitute 'good faith efforts' " and noted that "[t]he duty of a parent to support a minor child exists irrespective of the child's academic performance." (Assem. Com. on Judiciary, com. on Assem. Bill No. 716 (1985-1986 Reg. Sess.) Mar. 26, 1985, p. 2.) The bill was subsequently amended to replace the "good faith effort" language with the current language specifying that the child must be a "full-time high school student." (Assem. Amend. to Assem. Bill No. 716 (1985-1986 Reg. Sess.) Apr. 22, 1985.)

Based on this legislative history, we conclude that applying the Education Code's definition of "full-time" furthers the legislative purpose of Family Code section 3901. Requiring a post-majority child to conform to district attendance requirements for the normal length of the schoolday affords them the opportunity to complete a high school education on the same terms as minor children and furthers the goal of educating a more employable citizen. Adopting a different rule based on the exact number of credits the student happens to be taking in any given term or quarter would defeat the purpose of the statute by arbitrarily denying child support for those who have already accumulated excess credits and are able to take a lighter load to graduate in their senior year. Applying the schoolday definition also curbs the potential for abuse by holding a post-majority child to the same standard as a minor child in terms of compulsory attendance.

Interpreting "full-time" as the length of a schoolday designated by the school district also reduces uncertainty about the term's meaning and gives local school districts appropriate discretion. The Education Code's definition prescribes use of an objective measure that is not dependent on a student's academic performance, course load, or a subjective interpretation of "good faith" effort, which a committee report expressed concern about when the

15

Legislature was considering the post-majority support bill.  The Education Code also provides for consideration of exemptions from compulsory education, valid excused absences, and alternate schedules in settings such as continuation schools.  (See, e.g., Ed. Code, §§ 48220 et seq. [exemptions in public day schools], 48400 et seq. [exemptions in continuation schools], 48260 [excused absences].)  Adopting the Education Code's schoolday definition thus promotes the Legislature's policy objectives.

Finally, we stress that courts should not be so rigid in applying the "full-time" standard that it defeats the Legislature's goal of continuing child support to afford unmarried students between the ages of 18 and 19 an opportunity to complete a high school education.  For example, the Education Code provides that students may have valid excuses for being absent from school, such as illness, death in the family, medical appointments, cultural ceremonies, and "other reasons that are within the discretion of school administrators and, based on the facts of the of the pupil's circumstances, are deemed to constitute a valid excuse."  (Ed. Code, §§ 48260, subd. (c), 48205, 48225.5.)  These provisions allow for flexibility in accounting for the many individual circumstances students face.  We cannot anticipate every unique situation that might arise, but the goal is generally to continue child support for high-school students between the ages of 18 and 19 if they are engaged in activities towards achieving a high-school degree that would satisfy the compulsory education requirements for minor children.

Accordingly, we conclude that "full-time" in the context of section 3901 generally means "the length of the schoolday [designated] by the governing board of the school district" where the child's parent or legal guardian resides.  (Ed. Code, § 48200.)  Because this is an issue of first impression, neither the parties nor the trial court had the benefit of our clarification of

16

the law.  Without any case law to guide them, the parties litigated the matter and the trial court decided it based on incorrect definitions of the term "full-time" as used in section 3901, subdivision (a).  We will therefore reverse and remand for the court to conduct further proceedings and issue a new order consistent with the above definition and other principles expressed in this opinion.  (See, e.g., *In re Charlisse C.* (2008) 45 Cal.4th 145, 167 [reversing and remanding for further proceedings where "the parties and the [trial] court focused on the wrong legal standards," the Supreme Court's decision was "new in some respects," and further information may have been available to the parties but not presented]; see also *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 824 ["Because the standard we announce is new, the proper course is to remand to the trial court for application of the . . . test formulated above to the facts of this case."].)

B.    *Application to Summer Months*

For the trial court's guidance on remand, we provide additional direction about how to apply this standard in deciding whether Father's obligation to pay child support ended in June 2020, when summer started after A.G.'s junior year. The Supreme Court's opinion in *United Educators*, *supra*, 8 Cal.5th 805, is instructive. In that case, the court considered whether school employees are eligible to collect unemployment benefits during summer months pursuant to Unemployment Insurance Code section 1253.3.[6] (*United Educators*, at p. 807.)

In analyzing whether a school district's summer session fell within one of the statute's ineligibility periods or whether the session was itself an "academic term" within the meaning of the statute, the court noted that an "academic year" is "conventionally understood to refer to a nine- or 10-month school calendar, typically running from August or September to May or June, followed by a period of summer recess. [Citations.]" (*United Educators*, *supra*, 8 Cal.5th at p. 813.) The court cited Education Code section 45102, subdivision (c), which refers to "the regular September–June academic year[,]" and subdivision (d)(1), which refers to "the period between the end of the academic year in June to the beginning of the next academic year in September[.]"

On remand, the trial court should take into consideration the school calendar for the schools A.G. was attending. During summer breaks, there is typically no designated schoolday for high-school students who attend a conventional high school with a nine- or 10-month calendar. A parent's child

---

[6] This statute provides that a school employee is not entitled to unemployment benefits "with respect to any week which begins during the period between two successive academic years or terms or, when an agreement provides instead for a similar period between two regular but not successive terms, during that period" if certain conditions were met. (Unemp. Ins. Code, § 1253.3, subd. (b).)

18

support obligation does not terminate just because a student who has turned 18 is taking either no classes or something less than a full course load during the summer break between traditional academic years. Such a result would defeat the purposes of section 3901 and run counter to the customary understanding of when a high school student is expected to attend school. At the same time, however, we recognize that some schools operate on a year-round calendar and do require attendance for students enrolled in the summer session. (*United Educators*, *supra*, 8 Cal.5th at p. 813, citing Ed. Code, § 37610 et seq.) We emphasize that we are not deciding the issue on this record, and the parties are free to present additional evidence on remand.

### III

Mother next contends that no evidence was properly before the trial court because Father did not move to admit any evidence at the hearing in October 2021. We disagree.

Section 217, subdivision (a), provides in relevant part: "At a hearing on any order to show cause or notice of motion brought pursuant to this code, *absent a stipulation of the parties* or a finding of good cause . . . , the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties." (Italics added.) Section 217 does not mandate live testimony when the parties indicate their desire to rely solely on declarations. (See *In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1127 (*Binette*).)

At the beginning of the RFO hearing in this case, Father's counsel stated that he was not requesting an evidentiary hearing and "just want[ed] this resolved today." Mother's counsel did not object or voice opposition to that proposal, and the court acknowledged that if the parties "just want to

19

submit" on the papers, they could do so. The court stated it had "read all the pleadings" and "all the exhibits" and asked Father's counsel whether there was "anything, other than what's in the pleadings," that he would like to argue. During argument about the meaning of "full-time," Father's attorney made reference to exhibits submitted with the parties' declarations without any objection from Mother's attorney, except regarding Father's assertion that 15 credits constitutes "full-time" at Grossmont. When Mother's counsel objected to the latter, the court noted that the parties could still request an evidentiary hearing, "but if you're all agreeing to just submit upon [the papers], that's fine too." Mother's attorney commented that Father was submitting on the papers as "the moving party," but her attorney made no request for a hearing and did not otherwise indicate he was opposed to submitting on the papers.

Mother's counsel proceeded to make arguments about how "full-time" should be defined, relying on statements from Mother's declaration and documents attached to it. He concluded his argument by noting that it appeared the court had "read everything . . . . And so I don't think there's anything else and [Father's counsel] indicated that he's the one that didn't want additional evidence. So I'm finished, as far as we're concerned."

During subsequent argument regarding sanctions, Mother's counsel objected many times, including on hearsay grounds when Father's attorney referenced receiving information that A.G. was no longer enrolled in River Valley. The court responded that "[t]he problem . . . is a lot of the evidence I have is hearsay. And it seems that for the most part both of you are submitting on it[.]" Mother's counsel responded that "what the charter school told [Father] was not for the truth. . . . So it's not relevant. And I'd already raised the objection to [the] unidentified person that said 15 units." The

20

court overruled the objection regarding information from River Valley and observed that it was "not that relevant in any case."[7] Again, Mother's counsel did not request an evidentiary hearing or contradict the court's assessment that the parties were choosing to submit on hearsay declarations.

We conclude that the parties agreed to rely on the pleadings and that the trial court properly considered the declarations and their attached exhibits as to the meaning of "full-time," with the exception perhaps of Father's hearsay assertion that 15 credits constituted "full-time" at Grossmont.[8] We reached a similar conclusion in *In re Marriage of Deamon* (2019) 35 Cal.App.5th 476 (*Deamon*). In *Deamon*, we rejected a party's argument that her ex-husband's declarations were not properly before the family court because she " 'did not agree to stipulate to the admission of the declarations' " and her ex-husband's attorney "never affirmatively offered the declarations and documents into evidence." (*Deamon*, at p. 483.) We concluded this argument failed "because nothing in section 217 requires a party to offer evidence at a motion hearing when the motion is being decided solely based on the party's written submissions, because no party has taken proper steps to present live testimony." (*Ibid.*)

While section 217, subdivision (a), requires the court to receive " 'relevant' " testimony that is " 'within the scope of the hearing' " when

_____

7       Mother interprets this statement as applying to the hearsay regarding Grossmont's full-time unit requirement, but the trial court was actually addressing the hearsay regarding A.G.'s enrollment at River Valley. We understand the trial court's comment about lack of relevance to mean that the latter was irrelevant to whether Mother should be sanctioned, which was the topic of discussion during that portion of the hearing.

8       We need not determine the propriety of the court's reliance on that statement because it is not relevant to the definition of "full-time" we adopt in this opinion and we are remanding for further proceedings.

21

offered by the parties, it does not foreclose the parties from submitting evidence through other means, such as declarations and pleadings. (See *Binette*, *supra*, 24 Cal.App.5th at p. 1129; Fam. Code, § 210 ["the rules of practice and procedure applicable to civil actions generally . . . apply to, and constitute the rules of practice and procedure in, proceedings under this [Family] code."]; Code Civ. Proc., § 2009 ["An affidavit may be used . . . upon a motion."].) Here, the trial court properly looked to the pleadings because neither party requested an evidentiary hearing or live testimony, despite repeated invitations to do so.

Mother relies on *In re Marriage of Pasco* (2019) 42 Cal.App.5th 585 (*Pasco*), to argue that the trial court erred in relying on the parties' declarations even though they were never admitted into evidence. However, the facts in *Pasco* are distinguishable because one of the parties in that case requested an evidentiary hearing and the case was set for trial. (See *id.* at p. 588.) On the first day of the trial, the court in *Pasco* refused to hear evidence even though both parties intended to present evidence. (*Id.* at p. 589.)

Here, neither party requested an evidentiary hearing, and neither party indicated that they intended to present additional evidence. When the court noted it had reviewed the pleadings and exhibits, Mother's attorney only raised an evidentiary objection as to hearsay relating to Grossmont's credit requirements. Her counsel also relied on Mother's declaration in his argument, indicating "an implicit agreement between the parties to rely on the documents submitted, unless the court directed otherwise." (*Binette*, *supra*, 24 Cal.App.5th at p. 1130.) Accordingly, we reject Mother's argument that no competent evidence was before the trial court.

# IV

Lastly, Mother argues that the trial court improperly shifted the burden of proof to her on Father's RFOs.  We disagree, and we conclude that in this instance an exception should apply to the general rule that the requesting party bears the burden of proof.

As noted, Mother has incorrectly presumed that Father's RFOs sought a reduction of a child support order as opposed to a finding that it had terminated as a matter of law.  Based on that erroneous presumption, Mother cites cases involving child support modifications to support her argument that Father bears the burden of showing that changed circumstances warrant termination of his obligation.  (See, e.g., *Cryer*, *supra*, 198 Cal.App.4th at p. 1054 [moving party in child support modification proceeding bears the burden of proof regarding changed circumstances]; *In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 576.)  Mother also cites *In re Marriage of Hubner* (2001) 94 Cal.App.4th 175 (*Hubner I*) and *In re Marriage of Hubner* (2004) 124 Cal.App.4th 1082 (*Hubner II*), which involved a father seeking suspension, and subsequently termination, of child support for a post-majority child who participated in a foreign exchange program abroad.  According to Mother, those cases support her contention that she should not bear any burden of proof regarding A.G.'s enrollment status.

However, those cases are readily distinguishable.  In *Hubner I*, the mother requested an upward modification in child support in part because of her son's desire to participate in a foreign exchange program.  (*Hubner I, supra*, 94 Cal.App.4th at p. 180.)  The mother submitted evidence to the trial court regarding the costs and nature of the program, and based on that evidence, the Court of Appeal found that the child would continue to meet section 3901's requirements while studying abroad and ordered the father to

23

pay child support during the program. (*Hubner I*, at p. 189.) The father, however, refused to make payments and claimed in *Hubner II* that his child support obligation terminated absent some ongoing "monthly proof" that the child continued to meet section 3901's requirements. (*Hubner II*, *supra*, 124 Cal.App.4th at pp. 1091–1092.) The Court of Appeal in *Hubner II* rejected the notion that "[m]onthly proof a child is still unmarried, or is still not self-supporting, or is still unemancipated, or is still attending high school or the like in order to trigger that month's child support obligation is not a prerequisite to entitlement to child support beyond the age of 18, or at any other age." (*Id.* at p. 1092.)

Here, Father did not seek periodic, ongoing proof that A.G. was a full-time student as a condition for paying child support. Rather, Father obtained evidence in the fall of 2020 suggesting to him that A.G. was no longer a full-time student, and because Mother did not notify Father regarding any condition terminating support pursuant to section 4007, Father sought a refund through the channel provided by subdivision (b) of that section. (See *Hubner II*, *supra*, 124 Cal.App.4th at p. 1092 [Legislature has "provided the payee parent must only notify the payor parent upon the happening of a condition which terminates the duty of support. The Legislature has provided the payor parent adequate protection by specifying any overpayments are subject to refund."].) Unlike the father in *Hubner II*, Father here used the proper statutory channels to challenge his child support obligations by raising the issue in filed RFOs, and only after unsuccessfully requesting information from Mother about A.G.'s enrollment status.

We conclude that the cases cited by Mother involving child support modifications do not control who bore the burden once the issue was properly

24

raised in Father's RFO. We therefore turn to generally applicable burden-of-proof principles to determine who bears the burden in this context.

The general rule allocating the burden of proof is that "[e]xcept as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500; see *In re Marriage of Hein* (2020) 52 Cal.App.5th 519, 536 (*Hein*).) Although the moving party usually bears the burden of proof, courts have altered the normal allocation of the burden when certain factors favor doing so: " '[1] the knowledge of the parties concerning the particular fact, [2] the availability of the evidence to the parties, [3] the most desirable result in terms of public policy in the absence of proof of the particular fact, and [4] the probability of the existence or nonexistence of the fact.' [Citation.]" (*Hein*, at p. 537; see also *Adams v. Murakami* (1991) 54 Cal.3d 105, 119 ["Fundamental fairness must be the lodestar for our analysis."]; *Amaral v. Cintas Corp.* (2008) 163 Cal.App.4th 1157, 1188 ["courts may alter the normal allocation of the burden of proof."].)

In the absence of an express allocation of the burden of proof in the Family Code or other statutes for a motion seeking a judicial determination that child support has terminated as a matter of law, we start by considering the knowledge of the parties concerning A.G.'s enrollment status. This factor weighs in favor of Mother bearing the burden of proof because as the parent who had primary custody and still resided with A.G., Mother had the best knowledge of A.G.'s enrollment status and school attendance. Father's declaration attached exhibits, which Mother did not object to, including text messages in which Mother made representations about A.G.'s enrollment in October 2020, as well as an email addressed to Mother from an employee at

25

River Valley asking about A.G.'s attendance. These documents show that Mother had superior knowledge regarding A.G.'s school attendance.

For similar reasons, the second factor addressing the availability of the evidence to the parties also weighs in favor of allocating the burden of proof to Mother. As the custodial parent with whom A.G. still lived, Mother was in a unique position to access relevant information and documents regarding A.G.'s enrollment status. Father attempted to obtain records from A.G.'s schools regarding her enrollment status, and he was only partly successful because according to Father's reply declaration, Mother prevented him from obtaining records from two school districts by "enlist[ing] A.G. to sign objections" to Father's subpoenas. This factor thus supports Mother bearing the burden of proof.

The third factor—public policy considerations—lends further weight to placing the burden of proof in this case on Mother as the custodial parent. Under Family Code section 4007, subdivision (b), Mother had the onus of notifying Father of the occurrence of a contingency under section 3901 that would terminate his child support obligations. Mother also bore the burden of obtaining medical documentation for an exemption to the full-time requirement under section 3901, subdivision (a)(2), and evidence indicates she might have done so here, but did not. Moreover, the Education Code burdens the custodial parent with the obligation, under penalties including fines, of compelling their child's attendance in compliance with compulsory education laws. (See Ed. Code, §§ 48260.5, subd. (b), 48293, 48450 [imposing duties on parents in continuation education context].) The responsibilities imposed on the custodial parent in these statutes reflect a policy prioritizing the custodial parent's involvement in the child's education. Although Mother

was strictly speaking no longer the custodial parent after A.G. turned 18, the record establishes that A.G. still lived with her.

The fourth factor—the probability of the existence or non-existence of the fact in dispute—is essentially neutral here. We have no way of knowing how common it is for full-time students in high school to be 18 years or older, unmarried, and not self-supporting. (§ 3901, subd. (a)(1).) As a general matter, however, the burden of proving a statutory exception rests on one who claims its benefits. (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 23.) Mother is basically claiming the benefit of a statutory exception to the rule that child support terminates when the child becomes an adult. (§ 3901, subd. (a)(1).)

We conclude that because the relevant factors favor shifting the burden of proof to Mother, on remand, she should bear the burden of proof as to A.G.'s status as a full-time high school student during the time period placed at issue by Father's RFO.

## DISPOSITION

We reverse the trial court's order and remand for further proceedings, including additional discovery, if necessary, so that the court may make appropriate findings and enter a new order consistent with the principles discussed in this opinion.  The parties shall bear their own costs on appeal.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.